**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MAGELLAN AEROSPACE, MIDDLETOWN, INC., | : | Case No. 26-11937 |
| | : | |
| | : | |
| Debtor. | : | Honorable Beth A. Buchanan |

**DECLARATION OF MICHAEL I. GOLDBERG**
**IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Michael I. Goldberg, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtor. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

2. I am the sole independent director of Magellan Aerospace, Middletown, Inc. (the "**Debtor**"), an Ohio corporation located in Middletown, Ohio. As such, I have worked diligently to familiarize myself with the Debtor's operations, capital structure and finances, as well as the many challenges facing the Debtor.

3. I am knowledgeable and familiar with the Debtor's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of this chapter 11 case. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtor or the Debtor's advisors, or my opinion, which itself would be based on my experience, knowledge, and information concerning the

- 1 -

Debtor's operations.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      I have over 20 years of experience working with distressed companies.  I am the President of Sonar Asset Management Group, Inc., a private company I founded in 2010 that specializes in the purchase of bankrupt accounts receivable, also known as trade claims.  Sonar currently serves as the managing member of three investment funds that have invested in approximately 200 bankruptcy cases over the last sixteen years.  As President, I oversee all aspects of Sonar's operations, including research, sales and trading, closing documentation, as well as financial reporting for tax, accounting and investor relations.  Prior to founding Sonar, I worked as a Managing Director at Longacre Fund Management, one of the pioneers of the claims trading industry, for seven years, serving as a distressed debt analyst specializing in analyzing bankruptcies and stressed credit.

5.      I also have over 35 years of experience in the investment industry.  Prior to Longacre, I was a Managing Director at Banc of America Securities, LLC in its mergers and acquisitions group responsible for business and education services, and Chase Securities, Inc. as a Vice President in its mergers and acquisitions group, advising clients in a wide range of industries.  I am a founding partner of Altitude Investment Management, LLC, a US-based global venture capital investment firm that invests in a diverse range of early-stage to growth companies and manages the Altitude Investment Partners, LP Fund.  I am one of four partners that oversees the Fund's investment committee and I am responsible for all aspects of the day-to-day management of the Fund including all of its administration, accounting, audit and tax compliance matters.  I currently serve as a Director for multiple companies, including as an Independent Director of another company in the midst of financial distress.

I.      **THE DEBTOR'S STRUCTURE AND BUSINESS AND THE REASONS FOR**

**FILING THIS CHAPTER 11 CASE**

A.      **History of the Debtor[1]**

6.      In 1927, Charles Lindberg's solo trans-Atlantic flight led to a national aviation

craze.  Every American wanted to be a pilot, and businessmen nationwide wanted to ride the

growing wave of aviation enthusiasm.

7.      On or about November 7, 1928, Robert A. Taft, future Ohio Senator and the son

of former U.S. President William Howard Taft, founded the Aeronautical Corporation of America

(the entity that would eventually become Magellan Aerospace, Middletown, Inc., i.e. the Debtor)

with a group of prominent Ohio businessmen.  Despite its impressive name, this corporation had

no "aeronautical" product to sell until being introduced to Jean-Alfred Roché in 1929.  Roché

was at that time the chief civilian engineer at McCook Field, the site of the first United States

military aviation research center, and would go on to become the Head Aeronautical Engineer of

the U.S. Army.

8.      For Roché, aviation was not just a day job.  In his free time he had designed and

attempted to market a single-seat personal airplane, but pre-aviation boom had been unable to

find the necessary investor capital to produce his plane.  The Debtor bought Roché's design (for

stock and a seat on its board), adapted it for mass production, and released it as the C-2 Scout in

1929—just as the stock market collapsed.

9.      Yet, despite the Great Depression's negative impact on airplane manufacturers,

the C-2 was a success—arguably America's first successful "personal" airplane.  Affectionately

---

[1] Much of the description of the Debtor's past history is compiled from available documentation and third party
historical research, particularly for the earliest decades.  The Debtor has undertaken diligence to attempt to confirm
these facts, but statements about the Debtor's history should not be deemed admissions by the Debtor.

nicknamed the "flying bathtub," the C-2 was lightweight, simple to fly, and affordable.  It helped popularize general aviation in the United States, inspiring the growth of flying schools and clubs.

10.     In 1931, the Debtor introduced the C-3 "Collegian" a two-seat version of the C-2, allowing personal-plane owners to carry passengers, and giving financially strapped flight schools the option to buy cheap trainers.  By the mid-1930s, the Debtor led the U.S. in light aircraft production, with competitors emerging in the "flivver-plane" movement.  The Scout evolved into the Chief and Super Chief in 1937, while the new Model 40 Chief commenced in 1938.

11.     A major flood in 1937 destroyed the Debtor's original Lunken Airport factory and early blueprints, prompting a move to Hook Field Municipal Airport in Middletown, Ohio.  The Debtor changed its name to Aeronca Aircraft Corporation in 1941.

12.     In the lead-up to and during World War II, over 1,000 Aeronca aircraft were put into training service under U.S. military programs to train young Americans to become pilots.  An Aeronca model, the L-3 Grasshopper, also saw extensive use in both the Pacific and European war zones, including as an aerial commanders' observation platform, close-in reconnaissance aircraft, artillery spotting and fire control, emergency medical evacuation ambulance, small cargo and personnel transport, and other tasks.

13.     Post-war, the Debtor returned to civilian aircraft production, and produced popular models such as the Champion, Chief, Super Chief, Defender, and Arrow.  However, despite high production rates and demand, a postwar recession and market pressures led the Debtor to exit the light aircraft business in 1951.  The Champion design, one of the most popular personal airplane designs in American history, was sold to Champion Aircraft Company, later

passing through Bellanca and American Champion, which continues to manufacture consumer airplanes.

14. Following its exit from aircraft manufacturing, the Debtor shifted focus to high-strength engine and airframe structures for commercial, military, and space applications. The Debtor had already been developing a new specialty: brazing and bonding heat-resistant aircraft components. The Debtor's high temperature, brazed honeycomb structures shielded the command modules used in the Apollo lunar space program and, decades later, the Space Shuttle.

15. In 1950 the Debtor changed its name to Aeronca Manufacturing Corporation and in in the late 1950's, the Debtor acquired Longren Aircraft Company, Inc. ("**Longren**") with the Debtor as the surviving entity. Longren had operated an aerospace production facility in Torrance, CA, which continued to operate under the Debtor until it was sold in the early 1990s.

16. In 1969, the Debtor was reorganized and officially changed its name to Aeronca, Inc. Through a series of corporate transactions beginning in the late 1980's and ending in the mid-1990's, the Debtor became a subsidiary of Magellan Aerospace Corporation ("**Magellan Corp.**").

17. In 2000, fueled by a new jet exhaust systems contract, the Debtor began an $11 million, 10,000-square-foot expansion and renovation of its Middletown, Ohio, facilities. The Debtor invested in millions to engineer and develop a new exhaust system for the Airbus A340 and then brand new A318 aircraft in collaboration with another company. The exhaust system for the Airbus A380 aircraft was also awarded. The Debtor was also fulfilling a similar follow-up contract for the Boeing 747 and 767 aircraft. Production of the A340 ceased in 2011.

18. In 2012, the Debtor officially changed its name to Magellan Aerospace, Middletown, Inc. Middletown has continued to explore new opportunities and in 2016 enhanced

its brazing and honeycomb through the acquisition of Benecor Inc.'s assets.  In 2017 the Debtor and an affiliated company were awarded a contract to design, develop and manufacture exhaust systems for the A320neo PW1100G-JM nacelle with first units expected to enter into service in 2022.

19.     In 2020, however, the program was cancelled by the customer, and other projects such as the A380 aircraft and Boeing 747 aircraft wound down shortly after.  Over the last number of years, the Debtor's revenue has decreased year on year as a result of the winddown of the contracts mentioned above.

20.     The Debtor's impact on American aviation still resonates with aviation enthusiasts and experts today.  Every two years, the National Aeronca Association, an organization dedicated to supporting the design and preserving the history of Aeronca aircraft, convenes at Hook Field in Middletown, Ohio, where all of the Debtor's post war planes were produced.

### B.     Business Operations

21.     The Debtor operates an aerospace manufacturing facility in Middletown, Ohio, where it manufactures jet engine nacelle, exhaust components and heat-resistant space products. The Debtor employs 109 people.  In 2025, the Debtor had approximately $26.3 million of annual gross revenue, but its net income was loss of $8.5 million.  In 2026, through June 30, 2026, the Debtor has had approximately $16.8 million in revenue, but its net income has been a loss of $2.8 million.

### C.     Corporate Structure

22.     The Debtor is an Ohio corporation first formed in 1928.  Originally formed as the "Aeronautical Corporation of America," it changed its name in 1941 to "Aeronca Aircraft Corporation," in 1950 to "Aeronca Manufacturing Corporation," and in 1966 to "Aeronca, Inc."

where it continued under that name until 2012 when Aeronca, Inc. changed its name to Magellan

Aerospace Middletown, Inc.  Through a series of corporate transactions in the mid-1980's to the

mid-1990's, beginning with a 1986 transaction with Fleet Acquisition Corporation, the Debtor

became part of the Magellan family of companies.

23.      Magellan Aerospace USA, Inc. ("**Magellan USA**"), a Delaware corporation,

owns 100% of the shares of the Debtor.  Magellan USA is owned by Magellan Aerospace

Limited ("**Magellan LTD**"), an Ontario business corporation.  Each of these companies is in the

business of aerospace manufacturing.  Magellan LTD is owned by Magellan Corp., an Ontario

business corporation and a holding company that is publicly traded on the Toronto Stock

Exchange under the ticker "MAL.TO."

24.      As part of this larger family of aerospace manufacturers, the Debtor benefits from

substantial shared services, centralized expertise, economies of scale, greater purchasing power,

reduced overhead costs, operational efficiencies and enhanced financial and strategic resources

that result in reduced expenses and greater ability to compete for business.  The Debtor does not

pay for separate insurance, but is instead covered by broad policies paid for by the corporate

parent. Despite these efficiencies, the Debtor has been losing money for several years.

### D.      Capital Structure

25.      The Debtor is fully owned by Magellan USA and has no secured debt and no

public debt.  Rather, its obligations are unsecured debt owed to Magellan USA, legacy

environmental liabilities and trade debt to its suppliers, employees, unions and others.

#### 1.      *Unsecured Debt*

26.      The Debtor has substantial unsecured indebtedness.  Among others, Magellan

USA has funded loans to the Debtor in excess of $80 million.  In addition, the Debtor owes

approximately $1.8 million to suppliers, $450,000 to its employees, $500,000 to its retiree medical plan, as well as additional trade debt.

### 2. *Environmental Liabilities*

27. As more fully described below, two governmental authorities have issued environmental clean up orders directed at the Debtor, among other entities. The Debtor has already expended more than $13 million complying with these clean up orders and defending against lawsuits and expects to incur an estimated $10 million over the next six months.

28. The City of Torrance ("**Torrance**") commenced an action against the Debtor and other parties seeking damages and equitable relief. Following trial, a jury returned a verdict against the Debtor in the amount of approximately $5.2 million for past damages claimed by Torrance, and a 25% allocation for the cost of remediation. Remediation costs are estimated to be in the range of $25 to $64 million. The jury also issued advisory verdicts on statutory and equitable claims, including a recommended contribution of approximately $1.9 million from Debtor to another party. The court has not yet entered a final judgment, and the amount ultimately recoverable against the Debtor remains subject to further proceedings.

29. On February 12, 2026, the California Department of Toxic Substances Control (the "**DTSC**") issued an Imminent and Substantial Endangerment Determination and Order (the "**DTSC Order**") directing Debtor, as a Respondent, to implement immediate interim measures to mitigate indoor air concentrations of trichloroethylene ("**TCE**" ) and protect human health at 310 Euclid Avenue, San Diego, San Diego County, California 92114 (the "**Langley Property**") and the adjacent 149 unit residential apartment complex and all other properties impacted by migrating hazardous substances (collectively, the "**San Diego Property**").

## II.    THE EVENTS LEADING TO THE CHAPTER 11 FILINGS

30.    Several events have led to the Debtor commencing this chapter 11 case.

### A.    Business Challenges

31.    Over the past few decades, a number of the Debtor's key contracts have or are coming to an end and the Debtor has struggled to find significant new business, leading to decreased revenue.

32.    In 2000, the Debtor invested $11 million in a 10,000-square-foot expansion and renovation of its Middletown, Ohio, facilities.  The Debtor also invested millions to engineer and develop a new exhaust system for the Airbus A340 and the then-brand new A318 aircraft in collaboration with another company.  In addition to manufacturing the exhaust system for the A340 and 318, the Debtor was awarded the contract to manufacture the exhaust system for the Airbus A380 aircraft.

33.    However, production of the A340 ceased in 2011, production of the A318 ceased in 2013, and production of the A380 ceased in 2021.

34.    In the early 2000s, the Debtor was also fulfilling a similar follow-on contract for the Boeing 747 and 767 aircraft.  However, the final Boeing 747 aircraft was produced in 2021 and Boeing plans to end commercial production of the 767 in 2027, although some military production will remain.

35.    Over the last few years, the Debtor's revenue has decreased year on year as a result of the winddown of the contracts mentioned above.

36.    The Debtor has continued to adapt and improve its capabilities.  In 2016 the Debtor enhanced its brazing and honeycomb through the acquisition of Benecor, Inc.'s assets.  And, the Debtor continues to hold numerous industry certifications, including ISO 9001.

37.     Yet, despite the Debtor working diligently to obtain new business, it has not been successful enough to replace the lost revenue from its previous contracts, partially due to events outside of the Debtor's control.  In 2017, for example, the Debtor and an affiliated company were awarded a contract to design, develop and manufacture exhaust systems for the A320neo PW1100G-JM nacelle with first units expected to enter into service in 2022.  Unfortunately, that program was cancelled by the customer in 2020.

### B.     Legacy Environmental Liability[2]

38.     The Debtor faces significant compliance and litigation costs due to legacy environmental liability.

#### 1.     *Torrance, CA Liability*

39.     Longren Aircraft Company began operating, initially as a limited partnership, at an industrial site in Torrance, CA ("**Torrance Property 1**") in 1954, renting the property from Torrance.

40.     Longren Aircraft Company was incorporated in California as Longren Aircraft Company, Inc. in 1956, and in the late 1950's, the Debtor, then named Aeronca Manufacturing Corporation, acquired Longren, with the Debtor as the surviving entity.  As a result of the Longren acquisition, the Debtor assumed liability related to the operation of Torrance Property 1.  Debtor's operations at Torrance Property 1 ended in 1987.

41.      The Debtor also subleased and operated at a nearby industrial site leased from Torrance in the late 1960's and early 1970's (the "**Torrance Property 2**" and collectively, with

---

[2] The statements in this Declaration are intended to be a general description of alleged disputed environmental issues.  Nothing contained herein shall constitute an admission by the Debtor.

Torrance Property 1 and neighboring properties impacted by hazardous substances, the

"**Torrance Properties"**).

42.     The Debtor was named in litigation commenced by Torrance concerning

environmental contamination at the Torrance Properties and is subject to a Cleanup and

Abatement Order issued by the California Regional Water Quality Control Board ("**RWQCB**").

Although the assertions made by the RWQCB in the Cleanup and Abatement Order are subject to

a Debtor administrative petition and the subject of the trial discussed in paragraph 43 below, in

the past Debtor undertook certain investigations under the oversight of the RWQCB in the area

where Debtor formerly operated.  In addition, since completion of the trial discussed below,

Debtor has been involved in discussions with the RWQCB in connection with additional work

Debtor anticipates performing in certain areas where it formerly operated.

43.     In March 2026, the parties completed a four-week trial.  The jury returned a

verdict finding the Debtor and a co-defendant, who currently operates at the Torrance Airport,

were jointly and severally liable to Torrance for over $5.2 million in past investigation and

cleanup costs.  The jury also issued advisory verdicts on statutory and equitable claims, including

a recommended contribution of approximately $1.9 million from Debtor to a co-defendant and

third-party plaintiff, and that the Debtor was liable for 25% of the Torrance Properties

remediation costs, both of which remain subject to the Court's final determination.

44.     The Debtor is awaiting the Court's ruling on those statutory and equitable issues

and entry of final judgment.  Depending on that ruling, the Debtor could face additional

obligations, including payments to Torrance and other parties for past costs, as well as

responsibility for future cleanup costs and regulatory oversight.

### 2.    *San Diego Liability*

45.    A corporation originally known as the Langley Corporation, and its successors, operated an industrial facility in San Diego, CA (the "**Langley Property**"), allegedly from 1953 to the early 1990s, when it undertook a voluntary environmental assessment and cleanup in order to sell it to the Jacob Center for Nonprofit Innovation on May 15, 1998, after having received a No Further Action letter from the DTSC.  To everyone's surprise, elevated levels of TCE vapors were discovered in buildings on the Langley Property and on the adjacent 149-unit residential apartment complex, which resulted in the DTSC Order.  Debtor, as one of the Respondents, has been directed by the DTSC Order, and has agreed to implement immediate interim measures to mitigate indoor air concentrations of TCE and to, among other things, undertake a remediation investigation and feasibility study for the entire San Diego Property.

46.    The Langley Corporation was incorporated in California in 1939.  In 1983, the Langly Corporation acquired the Langley Corporation with the Langly Corporation as the surviving entity.  In 1989, the Langly Corporation and Fleet Acquisition Corp. entered into a strategic transaction, and although the Langly Corporation was the surviving entity, it changed its name to Fleet Aerospace, Inc.  As a result of this transaction, Fleet Aerospace, Inc. assumed liability related to the operation of the Langley Property.

47.    Fleet Aerospace, Inc. directly owned the Debtor until 2018, when the Debtor acquired Fleet Aerospace, Inc., with the Debtor as the surviving entity.  Through this transaction, the Debtor assumed and became responsible for Fleet Aerospace, Inc.'s liabilities regarding the Langley Property.

48.    Since the issuance of the DTSC Order, the Debtor has been required to undertake and pay for investigation, mitigation and remediation (the "**Work**") or face significant fines.  The

Work costs imposed by the DTSC Order has included extensive testing and expert analysis to mitigate and develop a plan to address the TCE issues at the apartment complex and to develop a remediation investigation and feasibility study for the San Diego Property, as well as payment for that plan's implementation.

49.     The Debtor did not contest and has been complying with the DTSC Order.  In total, the Debtor has been advised by its environmental consultants that the cost just to satisfy the investigation and remedial feasibility portion of the DTSC Order will exceed $12 million.

### 3.     *Environmental Insurance Policies*

50.     Because the asserted environmental liability goes back many decades, the Debtor has undertaken substantial diligence to identify potential insurance coverage.  The Debtor has successfully identified certain insurance policies providing some coverage to the Torrance Properties and is in the process of attempting to locate insurance policies related to the San Diego Property.  Certain insurers have provided coverage while asserting a reservation of rights. Other identified insurers have been less cooperative.  While the insurance proceeds should provide very significant coverage with a collective total of over $100 million in policy limits, delays and denials by many of the carriers have made it difficult to comply with the numerous environmental demands.

### III.     PROPOSED STRATEGY TO EMERGE FROM CHAPTER 11

51.     In the second quarter of 2026, the Debtor began to realize that the obstacles it faced, including environmental litigation, professional fees and business headwinds were creating an unsustainable situation.  The problem was further exacerbated when the Debtor's parent company, Magellan USA, made clear that it would no longer fund the Debtor's continued losses.  Accordingly, the Debtor engaged Manatt, Phelps & Phillips, LLP and Rock Creek

Advisors, LLC ("**Rock Creek**") to assist in developing potential solutions.  Throughout these discussions, it became clear that substantial funding would be needed to provide liquidity both for operations and extraordinary expenses, including professional fees.  The Debtor has attempted, without success, to obtain third party financing.  As a result, Magellan USA has agreed to provide additional funding during this chapter 11 case, subject to this Court's approval.

52.     The Debtor intends to use this chapter 11 case to preserve its business as a going concern, maintain employment and customer relationships by addressing legacy liabilities and ongoing liquidity concerns through transparent, lawful, and court-approved mechanisms.  At the outset, the Debtor intends to use the breathing spell provided by the Bankruptcy Code to focus on stabilizing its business, operations and finances, so that it may analyze its ongoing operations, expenses and finances, to determine if sufficient changes will permit it to better compete in the market and continue as a stand-alone entity.

53.     At the same time, the Debtor and its advisors are exploring all other alternatives, such as a potential sale or other value maximizing transactions.

A.      **Post-Petition Financing**

54.     The Debtor has suffered net losses for the last several years.  In order to maintain operations, the Debtor has been dependent upon loans made by Magellan USA.  Before the Petition Date, however, Magellan USA made clear that it would no longer fund the Debtor.  It is clear that the Debtor cannot operate without continued funding.  Under these circumstances, the Debtor and its advisors determined that the Debtor would require significant post-petition financing to support its continued operations as well as the post-petition administration of this chapter 11 case.  The Debtor's access to sufficient liquidity through lending and other financial accommodations is vital to executing its continued existence and any exit strategy.  In light of the

Debtor's need for financing, the Debtor and its advisors have worked with Magellan USA, to provide that financing.

55.     The Debtor and its advisors also have attempted to identify other potential sources of post-petition financing.  Unfortunately, at this time, it appears that the only available source is Magellan USA.  Magellan USA, however, has agreed to provide post-petition financing on economic terms that are very favorable to the Debtor.

56.     Shortly before the Petition Date, Magellan USA, as lender, and the Debtor, as borrower, entered into the Debtor-in-Possession Term Sheet (the "**DIP Term Sheet**"), pursuant to which Magellan USA agreed to loan the Debtor up to of $20 million, for the purposes set forth in the proposed budget, including to fund operations and administrative expenses incurred by the Debtor.  The DIP Term Sheet further provides for $2 million to be made available upon interim approval, with the balance to be available upon final approval.

57.     The DIP Term Sheet provides a revolving credit facility (the "**DIP Facility**") to the Debtor, at terms significantly better than what would otherwise be offered from a third party lender.  The Debtor will only be required to pay interest at the rate of SOFR plus 1.5% and will not pay any origination fee, commitment fee, standby fee, original issue discount fee, prepayment fee, or exit fee.  Indeed, the only fee the Debtor will pay are the reasonable fees actually incurred by the lenders' attorney.  The Debtor will, however, rollup Magellan USA's unsecured loans at a rate of three-to-one (which will not harm other secured creditors, as there are none).  There can be no question that these terms are significantly better than DIP Financing that would otherwise be available in the market—if the Debtor even could obtain other financing.

58.     As the Debtor's independent director, I am the sole member of the special committee formed to review, consider, negotiate and, if appropriate, approve, any transactions with related parties.  As a result, with the assistance of the Debtor's advisors, discussions on the post-petition financing have been led by me and I alone have considered and approved, subject to this Court's approval, the proposed financing on behalf of the Debtor.

**B.      Path Forward**

59.     The Debtor, with the assistance of its advisors, intends to use this chapter 11 case to explore all available restructuring alternatives, including but not limited to a chapter 11 plan of reorganization and a sale of substantially all assets pursuant to section 363 of the Bankruptcy Code, or other strategic transactions.  The Debtor is presently considering all options and has not yet made a determination as to which path will be pursued.  The Debtor reserves all rights to pursue any course of action that maximizes value for stakeholders and is in the best interests of the estate.

60.     The Debtor, however, intends to move expeditiously.  In this regard, the Debtor has been working diligently with Rock Creek to design and prepare a comprehensive marketing process and expects to begin the process, among other things, by contacting potential buyers, in the next week.  At the same time, the Debtor will further consider the potential of a standalone reorganization.  In light of the need to move quickly, the Debtor expects to make a decision and promptly return to Court to begin executing the appropriate strategy, within the next 2-4 weeks.

**IV.     EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS**

61.     Contemporaneously with the filing of this Declaration, the Debtor has filed several first day motions (each, a "**First Day Motion**" and, collectively, the "**First Day**

**Motions**"),[3] seeking relief that the Debtor believes is necessary to enable it to avoid immediate

irreparable harm and to efficiently administer its estate with minimal disruption and loss of value

during this chapter 11 case and ensure the continued fulfillment of Debtor's contractual

obligations.  The Debtor requests that the relief requested in each of the First Day Motions be

granted as each is a critical element in ensuring the maximization of value of the Debtor's assets

and estate.

     **A.**     **DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e); (II) SCHEDULING A FINAL HEARING ON THE MOTION PURSUANT TO BANKRUPTCY RULE 4001, AND (III) GRANTING RELATED RELIEF**

62.     The Debtor seeks entry of an interim order (a) approving and authorizing, on an

interim basis, the Debtor to (i) obtain post-petition debtor-in-possession financing from its

existing pre-petition unsecured lender and parent, Magellan USA, (ii) execute and deliver DIP

Documents that conform with the terms outlined in the DIP Term Sheet, including such other

documents, agreements, filings and instruments required by Magellan USA in its discretion in

connection with such debtor-in-possession financing, (b) approving, on an interim basis, the

terms and conditions of the DIP Loan, including, but not limited to, (i) authorizing the Debtor to

borrow under the DIP Loan an initial amount of up to $2,000,000 and further, pending a final

hearing on this Motion, (ii) authorizing the additional terms outlined in the DIP Term Sheet and

any interim or final order, (iii) scheduling a final hearing after expiration of the fourteen (14) day

period required by Bankruptcy Rule 4001, (iv) approving the form and manner and notice of the

Final Hearing to consider entry of a final order granting the relief sought herein on a permanent

---

[3] Capitalized terms used but not defined in the discussion of a particular First Day Motion, shall have the meaning ascribed in such First Day Motion.

basis, and (c) granting related relief; and with the final order (a) approving, on a final basis after the Final Hearing, the terms and conditions of the DIP Loan as outlined in the DIP Term Sheet hereto and (b) granting such other and further relief as the Court deems just and proper.

### 1.    *The Existing Loans And Need For Post-Petition Financing*

63.    The Debtor has suffered net losses for the last several years.  In order to maintain operations, the Debtor has been dependent upon loans made by its corporate parent, Magellan USA.  The Debtor currently owes over $80 million to Magellan USA in unsecured intercompany loans.

64.    Before the Petition Date, Magellan USA made clear that it would no longer fund the Debtor on an unsecured basis.  It is clear, however, that the Debtor cannot operate without continued funding.

65.    If the Debtor does not have the funding to continue to pay for supplies and employees, it will fail to fulfill the demands of the contracts it has entered into.  This would not only cause the Debtor to breach its contracts and create liability—it would destroy the Debtor's relationships with its clients, relationships the Debtor depends on for its continued existence. The Debtor cannot simply seek out new clients. 80% of its revenue comes from its top three clients, and the aerospace industry has a limited number of institutional buyers.

66.    The Debtor is also required to pay the compliance costs of the DTSC Order, which as discussed above, will require millions of dollars this year alone. If the Debtor stops paying the numerous environmental vendors currently working to comply with the DTSC Order, it will no longer be in compliance with the DTSC Order, and per that order, will be required to pay $25,000 for each day it remains noncompliant.

67.     Under these circumstances, the Debtor and its advisors determined that the Debtor would require significant post-petition financing to support its continued operations as well as the post-petition administration of this chapter 11 case.

68.     In light of the Debtor's liquidity needs, the DIP Financing is vital to its continued existence and the execution of any exit strategy.  The Debtor and its advisors, including Michael I. Goldberg, its Independent Director, have worked with Magellan USA to provide that financing.

### 2.     *Description of the Debtor-in-Possession Financing*

69.     The material terms of the DIP Loan are outlined in the motion seeking approval of the post-petition financing (the "**DIP Motion**"), the DIP Term Sheet attached as Exhibit B to the DIP Motion, and the Interim DIP Order attached as Exhibit A to the DIP Motion.

70.     Shortly before the Petition Date, Magellan USA, as lender, and the Debtor, as borrower, signed the DIP Term Sheet, pursuant to which Magellan USA agreed to provide the Debtor with a revolving credit facility of up to $20,000,000, for the purposes set forth in the proposed budget, including to fund operations and administrative expenses incurred by the Debtor.  The DIP Term Sheet further provides for $2,000,000 to be made available upon interim approval, with the balance to be available upon final approval.  And, the DIP Term Sheet provides for the roll-up of Prepetition Loans at a rate of three to one, which will not be effective until entry of the Final Order.

### 3.     *This Court Should Approve the Debtor-in-Possession Financing*

71.     The Debtor and its advisors attempted to identify other potential sources of post-petition financing. The Debtor solicited proposals from sources outside of the Debtor's capital structure with the goal of obtaining debtor-in-possession financing on terms that were the most

advantageous to the Debtor.  The potential third-party lenders contacted by the Debtor included various institutions that routinely provide debtor-in-possession financing, including both well-known commercial banks, credit funds and specialty lenders.  No third parties contacted by the Debtor were interested in providing debtor-in-possession financing except Magellan USA, the proposed DIP lender.

72.     Fortunately, Magellan USA has agreed to provide post-petition financing on economic terms that are very favorable to the Debtor.  The DIP Term Sheet sets the Debtor's interest at SOFR plus 1.5% and does not require that the Debtor pay any origination fee, commitment fee, standby fee, original issue discount fee, prepayment fee, or exit fee.  The only fee the Term Sheet requires the Debtor pay are the reasonable fees actually incurred by Magellan USA's attorney.

73.     The DIP Term Sheet does provide that the Debtor will roll up Magellan USA's unsecured loans at a rate of three-to-one.  However, this roll up (1) will not be effective until entry of the final order, (2) will be calculated based on money drawn by the Debtor, and (3) will not harm other secured creditors, as there are none.

74.     The DIP Term Sheet demonstrates substantial support provided to the Debtor by Magellan USA. The DIP Facility is being offered with minimal fees and low interest rates by industry standards for DIP facilities. And, in light of the Debtor's current financial status, Magellan USA appears to be the Debtor's only financing option. The Debtor urgently needs financing to fulfill its contractual obligations to its clients, pay necessary environmental vendors, and pay the administrative and professional costs of this bankruptcy. Thus, this financing is critical for the Debtor to preserve its estate and stabilize its operations.

75.     Following good faith discussions, the Debtor therefore agreed to enter into the DIP Term Sheet with Magellan, USA. Based on the foregoing, I believe that the relief requested in the DIP Motion is in the best interests of the Debtor, its estate and all parties in interest and should be approved.

**B.     DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) CONTINUE USING ITS CASH MANAGEMENT SYSTEM AND (B) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS; (II) WAIVING CERTAIN DEPOSIT GUIDELINES; AND (III) GRANTING RELATED RELIEF**

76.     The Debtor seeks entry of interim and final orders: (a) authorizing, but not directing, the Debtor to (i) maintain and continue using the Cash Management System and honor certain related prepetition obligations and (ii) maintain its existing bank account as described herein and continue using existing checks, business forms, and records; (b) granting the Debtor a waiver of certain bank account and related requirements of (i) the U.S. Trustee, set forth in the Region 9 Guidelines and (ii) 11 U.S.C. § 345, to the extent such requirements are inconsistent with any action taken by the Debtor in accordance with any order granting this Motion or any other order entered in the Debtor's bankruptcy case; and (c) granting related relief.

### 1.     *The Debtor's Current Cash Management System*

77.     In the ordinary course of business, the Debtor maintains one bank account with City National Bank (the "**Debtor Account**"). Until recently, the Debtor Account had a sweeping mechanism through which it pushed all surplus cash or usage of cash to the master account held by Magellan USA at the end of each day.  The sweeping mechanism had been in place for over 20 years. **However, the Debtor has requested that City National Bank deactivate the sweeping mechanism within the Debtor Account, meaning that by shortly after the Petition Date, the Debtor's account will no longer sweep to Magellan USA at the end of each day**.

78.     The Debtor uses the Cash Management System in the ordinary course of business to collect, transfer, and disburse funds generated from its business activities and to facilitate cash monitoring, forecasting, and reporting.

79.     As part of its Cash Management System, the Debtor utilizes numerous preprinted business forms (including letterhead, purchase orders, invoices, and preprinted checks) in the ordinary course of business.

### 2.     *The Debtor's Current Cash Management System is Compliant with Section 345(b) of the Bankruptcy Code and Guidelines*

80.     The Debtor accounts for and records all receipts and disbursements for the Debtor Account.  The Debtor can identify and track all transactions in the Debtor Account with specificity and provide accurate, complete, and detailed records to the U.S. Trustee.

81.     The Debtor maintains daily oversight over the Cash Management System and implements cash management controls for processing and releasing funds.  Additionally, the Debtor regularly reconciles its books and records to ensure that all transfers have appropriate authorizations and accounting.  The Debtor has implemented internal procedures to control or prohibit payments on prepetition debts without the prior approval of this Court and the Debtor's management.

82.     The Debtor Account is maintained at a bank insured by the FDIC and is on the list of authorized depositories approved by the U.S. Trustee, and therefore, the account complies with section 345(b) of the Bankruptcy Code.

### 3.     *The Debtor's Continued Use of the Current Cash Management System is Essential to the Debtor's Operations and Restructuring*

83.     The Cash Management System provides significant benefits to the Debtor including, among other things, ensuring the availability of funds when necessary, and reducing

costs and administrative expenses to the estate by facilitating the receipt of funds and ensuring

timely and accurate account transaction information.  Thus, to ensure the seamless operation of

the Debtor's business and realize the benefits of the Cash Management System, the Debtor

should be allowed to continue using the Cash Management System, as modified herein, and

should not be required to open a new bank account.

84.    Requiring the Debtor to open a new debtor-in-possession account, to maintain a

separate debtor-in-possession account for cash collateral, to obtain checks that bear the

designation "debtor in possession," and to reference the bankruptcy case number and the type of

account on such checks would severely disrupt the ordinary financial operations of the Debtor by

reducing efficiencies, depriving the Debtor of substantial revenues and causing unnecessary

expenses.

85.    Closing the Debtor's existing account and opening a new debtor-in-possession

account would unnecessarily utilize the Debtor's time and resources to the detriment of its estate,

its creditors, and all parties-in-interest. And, perhaps more importantly, it would take substantial

time for payors into the Debtor Account to migrate their payments to a new account.  During that

time, the Debtor and its customers would suffer harm.

86.    Requiring the Debtor to utilize a new set of business forms would similarly cause

unnecessary expense to the estate and lead to confusion on the part of employees, customers,

vendors, and suppliers during the pendency of this chapter 11 case. Allowing the Debtor to

continue to use all preprinted correspondence and business forms (including, without limitation,

letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence

immediately before the Petition Date (and without reference to the Debtor's status as debtor in

possession) would allow the Debtor to avoid incurring the expense and delay ordering new Business Forms.

87. The Debtor also plans to modify its existing cash management system to provide a clear line of demarcation between prepetition and postpetition claims and payments to help protect against the inadvertent payment of prepetition claims. So, the Debtor will not be sweeping cash into a separate bank account, will engage in diligent record-keeping, will carefully distinguish between prepetition claims and postpetition claims, and will direct City National Bank not to honor prepetition claims except as directed by the Court.

88. Based on the foregoing, I believe that the relief requested in this motion is in the best interests of the Debtor, its estate and all parties in interest and should be approved.

**C. DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING, BUT NOT DIRECTING, DEBTOR TO (A) PAY AND HONOR PREPETITION EMPLOYEE OBLIGATIONS, AND (B) MAINTAIN AND CONTINUE CERTAIN COMPENSATION AND BENEFIT PROGRAMS POSTPETITION; AND (II) GRANTING RELATED RELIEF**

89. The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to: (1) pay accrued wages, salaries, and other compensation such as bonuses; (2) pay certain vacation and paid time off policies, employee benefit plans, and severance; (3) reimburse Employees for prepetition expenses incurred on behalf of the Debtor in the ordinary course of business; (4) pay all related prepetition payroll taxes and deductions; (5) pay any third party Administrator that administers, brokers, insures, or pays any of the foregoing programs; (6) pay all Union obligations; and (7) maintain and continue the foregoing programs postpetition.

**1.** *Wages and Salaries*

90. The Debtor employs approximately 109 individuals (collectively, the "**Employees**")—105 full-time, 2 seasonal, and 2 corporate charge-back. As of the Petition Date,

certain prepetition obligations listed above will have accrued and remain unpaid given the

Debtor's payroll cycle.  The Debtor pays its salaried non-Union employees bi-weekly in arrears

such that each payroll covers approximately two weeks prior to the payroll date.  The Debtor

pays its Union employees weekly and in arrears, such that each payroll covers approximately one

week prior to the payroll date.

91.     The Debtor's last payroll will have been paid on July 16, 2026, but because all

Employees are paid in arrears, the Employees will be owed accrued but unpaid wages and

salaries at the time of the petition.  The total wages to be funded are approximately $350,000 for

prepetition services and $100,000 on related prepetition Taxes.  The Debtor seeks authorization,

but not direction, to continue paying the Employees their wages and salaries in the ordinary

course of business and to pay any prepetition amounts owed thereunder or related thereto.

92.     To the best of my knowledge, no single employee (weekly or bi-weekly) has

accrued $17,150 or greater in wages as of the Petition Date.  To the extent that any Employee is

owed more than $17,150 and the Debtor seeks to pay such greater amount, the Debtor will seek

authority to pay such amounts by separate motion.

### 2.     *Employee Benefits*

93.     As part of its Employee Benefits, the Debtor offers its Employees paid time off

including vacation pay and various standard employee benefits plans and programs, such as (i)

health insurance, (ii) dental insurance, (iii) vision insurance, (iv) workers' compensation

insurance, (v) COBRA coverage, (vi) short and long term disability, (vii) life and accidental

death and dismemberment insurance, and (viii) other miscellaneous benefits.

94.     The Debtor seeks authorization, but not direction, to continue all benefit programs in the ordinary course of business and to pay any prepetition amounts owed thereunder or related thereto.

### 3.     *Reimbursable Expenses*

95.     Prior to the Petition Date, the Debtor routinely reimbursed the Employees for Reimbursable Expenses incurred on behalf of the Debtor during the scope of their employment, including, without limitation, business related travel expenses and business meals.

96.     The Debtor is unable to precisely estimate the amount of Reimbursable Expenses due as of the Petition Date, because this amount depends on the Employees' submission of their expenses.  The amount owed to each individual Employee, however, is likely to be *de minimis.* The Debtor seeks authorization but not direction to continue reimbursing Employees for expenses incurred on behalf of the Debtor in the ordinary course of business and to pay any prepetition amounts owed thereunder or related thereto.

### 4.     *Withholding Obligations*

97.     The Debtor routinely deducts certain amounts from Employees' compensation that represents various Withholding Obligations, including for example, various federal, state and local income, Federal Insurance Contribution Act ("**FICA**"), unemployment and disability taxes and fees, union dues, insurance premium, and FSA withholdings.  The amount deducted and remitted by the Debtor with respect to Employee Withholdings averages approximately $55,000 per week in the aggregate.  Approximately $110,000 of deductions will have accrued prepetition but will not have been remitted to various third parties.  All of the amounts relating to the Employee Withholdings will become due within twenty-one (21) days of the Petition Date.

98.     The Debtor seeks authorization, but not direction, to continue deducting and remitting accrued but unfunded Employee Withholdings in the ordinary course of business and to pay any prepetition amounts owed thereunder or related thereto.

### 5.     *The Requested Relief is in the Best Interest of the Debtor and All Parties-In-Interest*

99.     The Employees are critical to the success of the Debtor's operation, to the fulfillment of the Debtor's contractual obligations, and to the continued existence of the Debtor's client relationships.  Thus, the Employees are critical to facilitate any potential post-petition reorganization or sale of operations at the highest possible values.  Failure to satisfy the Debtor's obligations with respect to their Employees in the ordinary course of business during this chapter 11 case will jeopardize Employee loyalty and trust, possibly causing Employees to seek alternative employment and disrupting the Debtor's operations.

100.    In addition, the Employees rely on their compensation, benefits, and reimbursement of expenses to pay their personal living expenses and the effect could be financially devastating if the Debtor does not pay them in the ordinary course of business.  Based on the foregoing, I believe that the relief requested in this motion is in the best interests of the Debtor, its estate and all parties in interest and should be approved.

**D.     DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. § 366(B)(I) PROHIBITING UTILITIES FROM ALTERING, REFUSING OR DISCONNECTING SERVICES TO, OR DISCRIMINATING AGAINST THE DEBTOR; (II) DETERMINING THAT THE UTILITIES ARE ADEQUATELY ASSURED OF FUTURE PAYMENT; AND (III) REQUESTING A FINAL HEARING**

101.    The Debtor seeks entry of interim and final orders (i) prohibiting utility companies from altering or discontinuing service on account of prepetition invoices, (ii) approving deposit account as adequate assurance of payment, and (iii) establishing procedures for

resolving requests by utility companies for additional adequate assurance of payment, pursuant to sections 105(a) and 366 of the Bankruptcy Code.

### 1. *The Debtor's Utilities*

102.    The Debtor has relationships with many different utility companies and other providers for the provision of electric, water, natural gas, trash, telephone, cellular telephone, and similar utility products and services. The Utility Companies include, without limitation, the entities set forth on Exhibit A to the motion.

103.    The average monthly amount owed to the Utility Companies by the Debtor is approximately $65,000.  The Debtor owes certain amounts to Utility Companies as of the Petition Date for prepetition Utility Services.  Due to the timing of the Petition Date in relationship to the Utility Companies' billing cycles, there are also Utility Services that have been invoiced to the Debtor for which payment is not yet due and Utility Services that have been provided since the end of the last billing cycle but not yet invoiced to the Debtor.  The Debtor seeks to pay the most recent invoice received from the Utility Companies, even if a portion of the period covered by the invoice is for the pre-Petition Date period.

### 2. *Adequate Assurance*

104.    The Debtor anticipates that the proposed DIP Funding, in addition to its cashflow, will be sufficient to satisfy all administrative expenses, and intends to continue paying its postpetition utility expenses in full.

105.    As adequate assurance sufficient to prevent the Utility Companies from altering or disconnecting service due to unpaid prepetition invoices under section 366(c) of the Bankruptcy Code, the Debtor offers both its history of regularly making timely payments in full to every Utility Company, and the creation of a Utility Deposit Account, an earmarked sum within the

Debtor's existing bank account that will be equal to approximately 50% of the estimated monthly cost of Debtor's utility services.

106.     The Utility Deposit Account combined with the Debtor's available cash, the DIP Financing, the fact that the Debtor has regularly made timely payments in full to each of the Utility Companies and only owes the current month's invoices provides the Utility Companies with ample adequate assurance of future payment under section 366(c) of the Bankruptcy Code. The Debtor's access to the DIP Financing means that the Debtor will have sufficient resources to pay all valid postpetition obligations for Utility Services in a timely manner.  In addition, the Debtor has significant incentives to stay current on its Utility Service obligations as they come due because of its reliance on the Utility Services for the operation of its business.

### 3.     *Additional Adequate Assurance Procedures*

107.     The Debtor proposes two additional sets of procedures—a method by which Utility Companies may file notices of delinquency with the Court and a method by which Utility Companies may request additional adequate assurance.

108.     These procedures provide a fair, reasonable, and orderly mechanism for the Utility Companies to ensure that they are not required to provide service while the Debtor remains delinquent, and for the Utility Companies to seek additional adequate assurance, if desired.

109.     For the foregoing reasons, I believe that the Debtor's offer of adequate assurance is sufficient to satisfy section 366(c) of the Bankruptcy Code, and thus the relief requested in this motion should be granted.

**E.      DEBTOR'S MOTION FOR AN ORDER EXTENDING TIME TO FILE
SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENT OF
FINANCIAL AFFAIRS**

110.    Because of the nature of the Debtor's current business affairs, the limited staff
available to perform the required internal review of its financial and other records, the additional
burden of the numerous items required to be completed to prepare for the First Day Hearing, the
other matters that the Debtor must address in the early days of this chapter 11 case, and the
pressure incident to the commencement of this chapter 11 case, the Debtor seeks entry of an
order granting it a 30-day extension of time until 44 days following the Petition Date to gather
information necessary to complete and file the required schedules of assets and liabilities and
statements of financial affairs. I believe this will assist in the general administrative efficiency of
this chapter 11 case and allow the Debtor to immediately begin maximizing value for the
Debtor's creditors.

**F.      DEBTOR'S MOTION SEEKING AUTHORITY TO IMPLEMENT
CERTAIN NOTICE AND CASE MANAGEMENT PROCEDURES**

111.    The Debtor seeks entry of an order approving certain Case Management
Procedures that, among other things, (a) establishes requirements for filing and serving court
filings, (b) delineates standards for notices of hearings and hearing agendas, (c) fixes periodic
omnibus hearing dates and articulates mandatory guidelines for the scheduling of hearings and
objection deadlines, and (d) limits matters that are required to be heard by the Court. Given the
size and complexity of this chapter 11 case, I believe that implementing the Case Management
Procedures will promote judicial economy and facilitate the fair and efficient administration of
this chapter 11 case.

**G. DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) SCHEDULING AN EXPEDITED HEARING ON AND SHORTENING THE NOTICE PERIOD FOR THE FIRST DAY MOTIONS AND APPLICATION FILED BY THE DEBTOR; (II) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (III) GRANTING RELATED RELIEF**

112. As described in each of the First Day Motions, the relief requested in the First Day Motions filed by the Debtor is essential to maintaining the viability of the Debtor's business and allowing the Debtor to maximize the value of its estates, to the benefit of all parties in interest. Accordingly, the Debtor believes that the First Day Motions involve matters that require an expedited, emergency hearing and shortened notice period.

113. I attest that the Debtor has given notice of the filing of the First Day Motions and the expedited hearing thereon to: (i) the Southern District of Ohio Office of the United States Trustee; (ii) the Debtor's 20 largest unsecured creditors; (iii) Magellan USA (the proposed DIP lender); (iv) counsel to Magellan USA; (v) all parties asserting a security interest in the assets of the Debtor to the extent reasonably known to the Debtor; (vi) all parties asserting a taxing interest in the assets of the Debtor to the extent reasonably known to the Debtor; (vii) the state attorneys general for all states in which the Debtor conducts business; and (viii) those entities specifically affected by a specific motion. Because of the exigencies of the circumstances and the irreparable harm to the Debtor that would ensue if the relief requested herein is not granted, the Debtor submits that no other notice need be given.

114. The Debtor has requested that service of notice on the parties stated above in the form and manner described herein be deemed adequate and appropriate under the circumstances and in full compliance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of this Court.

**H.      DEBTOR'S MOTION FOR AN ORDER DESIGNATING MICHAEL I. GOLDBERG AS DEBTOR'S RESPONSIBLE PERSON**

115.    The Debtor seeks entry of an order designating Michael I. Goldberg as the Debtor's Responsible Person under Rule 1074-1 of the Local Rules.

116.    I am the sole independent director of the Debtor and the person most knowledgeable about the events leading up to Debtor filing for bankruptcy. I have worked diligently to familiarize himself with the Debtor's operations, capital structure and finances, as well as the many challenges facing the Debtor.  Therefore, I am in the best position to be designated as Responsible Person for purposes of these proceedings

**I.      DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO REDACT CERTAIN PERSONALLY IDENTIFIABLE INFORMATION FOR THE DEBTOR'S EMPLOYEES; AND (II) GRANTING RELATED RELIEF**

117.    The Debtor seeks entry of an order (a) authorizing the Debtor to redact certain personally identifiable information for the Debtor's employees, and (b) granting related relief. Permitting the Debtor to redact certain employe information, namely their address, will allow the Debtor to ensure that its employees' privacy is not violated, and does not inconvenience anyone, as unredacted copies will be provided to the U.S. Trustee's and the Court's office.

**J.      APPLICATION OF DEBTOR FOR AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF STRETTO, INC. AS NOTICE, CLAIMS, AND SOLICITATION AGENT EFFECTIVE, NUNC PRO TUNC TO THE PETITION DATE**

118.    The Debtor proposes to engage Stretto, Inc. ("**Stretto**") to act as the Debtor's Notice, Claims, and Solicitation Agent. The Debtor asserts, and I believe, this retention is the most effective and efficient manner of noticing the creditors and parties in interest of the filing of this chapter 11 case and other developments. In that capacity, Stretto will transmit, receive, docket, and maintain proofs of claim filed in connection with this chapter 11 case.

119.    By appointing Stretto as the Notice, Claims, and Solicitation Agent in this chapter 11 case, the distribution of notices, the processing of claims, and the solicitation of votes will be expedited and the Clerk of the United States Bankruptcy Court for the Southern District of Ohio (the "**Clerk**") will be relieved of the administrative burden of processing what may be an overwhelming number of claims. The Debtor submits, and I believe, based on all engagement proposals obtained and reviewed, that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise.

120.    The fees to be charged by Stretto in connection with this chapter 11 case is set forth in the Services Agreement. The Debtor respectfully submits, and I believe that Stretto's rates for its services in connection with the notice, claims processing, and solicitation services are competitive and comparable to the rates charged by their competitors for similar services. Indeed, the Debtor conducted a review and competitive comparison of other firms prior to selecting Stretto as notice, claims, and solicitation agent and, following arm's-length negotiations, determined Stretto's rates to be more than reasonable given the quality of Stretto's services and Stretto's prior bankruptcy expertise.

I have reviewed each of the First Day Motions and believe that the relief requested in each of the First Day Motions is absolutely necessary to avoid immediate irreparable harm and ensure the ongoing operations of the Debtor.  I have reviewed each of the First Day Motions and the factual statements set forth therein.  I confirm that each of the factual statements in each of the First Day Motions is true and correct to the best of my knowledge and belief.  I adopt each of the factual statements set forth therein as my own, as if each were fully set forth herein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct in all respects.

Dated:    July 22, 2026
          New York, New York

/s/ Michael I. Goldberg
Michael I. Goldberg